## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** 100 F Street, NE Washington, DC 20549-6030 : : : : : | **10 CV** _____ |
| **Plaintiff,** : : | |
| **v.** : : : | |
| **DAIMLER AG,** Mercedesstrasse 137 70327 Stuttgart, Germany : : : : : : | |
| **Defendant.** : : : | |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("Commission") alleges that:

## SUMMARY OF THE ACTION

1.      From at least 1998 through 2008, Daimler AG, formerly known as DaimlerChrysler AG ("Daimler" or the "Company"), and certain of its subsidiaries and affiliates, violated the anti-bribery, books and records and internal controls provisions of the Foreign Corrupt Practices Act (the "FCPA") by making illicit payments, directly or indirectly, to foreign government officials in order to secure and maintain business worldwide.

2.      During this time period, Daimler paid bribes to government officials to further government sales in Asia, Africa, Eastern Europe and the Middle East.  In connection with at least 51 transactions, Daimler violated the anti-bribery provision of the FCPA by paying tens of millions of dollars in corrupt payments to foreign government officials to secure business in

Russia, China, Vietnam, Nigeria, Hungary, Latvia, Croatia and Bosnia. These corrupt payments were made through the use of U.S. mails or the means or instrumentality of U.S. interstate commerce.

3.     Daimler also violated the FCPA's books and records and internal controls provisions in connection with the 51 transactions and at least an additional 154 transactions, in which it made improper payments totaling at least $56 million to secure business in 22 countries, including, among others, Russia, China, Nigeria, Vietnam, Egypt, Greece, Hungary, North Korea, and Indonesia. Through these tainted sales transactions, which involved at least 6,300 commercial vehicles and 500 passenger cars, Daimler earned $1.9 billion in revenue and at least $91.4 million in illegal profits.

4.     Nineteen of these transactions, which occurred between approximately 2001 through 2003, involved direct and indirect sales of motor vehicles and spare parts under the United Nations Oil for Food Program. Those transactions included $6,048,948 in bribes in the form of under-the-table "after sales service fees." Daimler offered to pay kickbacks of more than $1 million under six direct contracts with Iraqi ministries; made one payment of $7,134 under a direct contract; and knowingly acquiesced in the payment of another $5 million in kickbacks by its contract partners in connection with twelve indirect Oil for Food contracts.

5.     A number of Daimler's former senior executives, who operated in a decentralized corporate structure, permitted or were directly involved in the Company's bribery practices, including the head of its overseas sales department, who reported directly to the Company's most senior officers. The Company's internal audit, legal, and finance and accounting departments, which should have provided checks on the activities of the sales force, instead played important roles in the subversion of internal controls and obfuscation of corporate records.

6.     The improper payments were made possible in part as a result of the falsification of corporate records and a lax system of internal controls.

7.     In this environment, Daimler developed several organized procedures and mechanisms through which improper payments could be made. Daimler's books and records contained over 200 ledger accounts, known internally as "*interne Fremdkonten*," or, "internal third party accounts," which reflected credit balances controlled by Daimler subsidiaries or outside third parties. Certain Daimler employees used numerous such accounts to make or facilitate improper payments to foreign government officials. Bribes were also made through the use of "corporate cash desks" (where sales executives would obtain cash in amounts as high as 400,000 Deutsche Marks for making improper payments), deceptive pricing and commission arrangements, phony sales intermediaries, rogue business partners and misuse of inter-company and debtor accounts.

## JURISDICTION AND VENUE

8.     This court has jurisdiction over this action under Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e) and 78aa]. Daimler, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

9.     Venue is appropriate in this Court under Section 27 of the Exchange Act [15 U.S.C. § 78aa] because Daimler, as a U.S. issuer, files required periodic reports with the Commission in this judicial district.

**DEFENDANT**

10.     Daimler, a publicly-held corporation organized under the laws of the Federal Republic of Germany, is a global company primarily engaged in manufacturing automobiles. The Company is headquartered in Stuttgart, Germany.[1] The Company's common stock is registered with the Commission pursuant to Section 12(b) [15 U.S.C. § 781(b)] of the Exchange Act and is listed on the New York Stock Exchange, where its stock is traded under the symbol DAI.

**FACTS**

11.     From at least 1998, employees of Daimler and certain of its subsidiaries and affiliates made improper payments to foreign government officials to further sales in many countries. This conduct dates back to a time when such payments were not prohibited by German law, and therefore were tax deductible according to the German Tax Code.

12.     Daimler internally referred to these payments as "N.A." payments, which was the abbreviation of the German term *nützliche Aufwendungen*, meaning "useful expenditures" or "useful payments."

13.     In February 1999, Germany outlawed foreign bribery when the Organization for Economic Cooperation and Development ("OECD") Anti-Bribery Convention, which Germany ratified, entered into force. Daimler, however, had been prohibited from making bribes to foreign government officials under the FCPA since 1993 when its predecessor, Daimler-Benz AG, registered a class of securities under § 12 of the Exchange Act.

14.     Notwithstanding its status as a U.S. issuer, the Company failed to end its long-standing bribery practices and bring its overseas sales business into compliance with the FCPA.

---

[1]  Up until the divestiture of Daimler's Chrysler division in May 2007, the Company was known as DaimlerChrysler AG, which was the product of the 1998 merger between Daimler-Benz and Chrysler Corporation.

15.     In fact, until recently, Daimler's FCPA compliance program, outside its former U.S.-based Chrysler division, was virtually non-existent, even though the Company has thousands of employees and dozens of affiliates and business units selling vehicles to foreign governments and government-related entities in many foreign countries.

16.     Although Daimler adopted a corporate Integrity Code in July 1999, which included anti-bribery provisions, it failed to adequately enforce those provisions or train employees outside the U.S. on FCPA compliance.

17.     Daimler also failed to implement meaningful oversight of the activities of its sales force.  Accounting and legal personnel often reported to top sales management, rather than independent, centralized departments with compliance functions.  In several instances, in fact, Daimler's legal and accounting departments aided the corrupt practices of the sales departments rather than provide a safeguard against such practices.

18.     Daimler also failed to maintain adequate controls over the selection of, or payments to, sales intermediaries, many of whom were actually nominees for government officials, or over the establishment and use of bank accounts.

19.     Daimler and certain of its subsidiaries and affiliates utilized a variety of instruments to make improper payments in at least 22 countries around the world.

20.     The instruments through which improper payments were made included hundreds of ledger accounts on Daimler's own books, corporate "cash desks" (where sales personnel would obtain cash), deceptive pricing and commission arrangements, offshore bank accounts, inflated service fees, and nominees for government officials improperly described as "sales intermediaries" and "consultants."

21.     Daimler's practice of securing business through the payment of bribes to foreign government officials permeated to several major business units and subsidiaries and was sanctioned by its senior management. Daimler's corrupt practices were carried out by major department heads of Daimler Overseas Sales and Commercial Vehicles.

22.     Similarly, improper payments were authorized by or known to the former heads of Daimler's Overseas Sales and Commercial Vehicles departments, the former heads of Daimler Export and Trade Finance (a subsidiary of Daimler Financial Services), and the former heads of Daimler's subsidiaries in Vietnam, China, Turkey, Indonesia, Ivory Coast, Nigeria, Russia and the EvoBus subsidiary ("EvoBus").

### A.     Daimler Used "Third-Party" Ledger Accounts to Facilitate Bribes

23.     When Daimler-Benz AG merged with Chrysler Corp. in November 1998, Daimler maintained over 200 ledger accounts known as "internal third party accounts" ("TPA" or "TPAs"), referred to in German as *interne Fremdkonten*, which were used for numerous business purposes. Since at least 1977, Daimler maintained written policies governing the operation of TPAs. Daimler's Overseas Sales department ("Overseas Sales") in many instances misused certain of these TPAs to facilitate improper payments to foreign government officials in Africa, Eastern Europe and the Middle East.

24.     Certain TPAs were managed by the most senior Overseas Sales executives, including the former head of Overseas Sales. The former head of finance and controlling for Overseas Sales and the then heads of certain Daimler subsidiaries also authorized disbursements from TPAs.

25.     Although the TPAs were internal Daimler general ledger accounts and managed by employees of Daimler and certain of its subsidiaries and affiliates, the funds in certain of the

TPAs were disbursed according to instructions given by third-party beneficiaries of the accounts, including government officials. Such credits recorded in the TPAs—usually were disbursed in cash or by wiring the money to bank accounts throughout the world.

26.     Some of the TPAs were known only to the few Daimler employees managing them, and payments from the accounts were often confidential, meaning that funds credited to and debited from these accounts and cash disbursements were often not transparent or subject to a paper trail or other financial controls.

27.     Given the unregulated nature of these accounts, over time, TPAs were used to forward large sums of cash throughout the world, assist Daimler's outside business partners and subsidiaries evade taxes in their respective countries of operation and pay salaries for Daimler expatriate employees working overseas, which, in effect, improperly shielded these funds from German tax authorities.

28.     Daimler maintained several TPAs on its general ledger in the name of its own overseas subsidiaries, which were controlled by the then heads of the subsidiaries and former Overseas Sales senior executives and used to facilitate government deals.

29.     In other cases, TPAs were maintained in Daimler's general ledger in the names of third parties outside the Company, including foreign government officials or Daimler's dealers, distributors or other agents, who were at times used as intermediaries to make payments to foreign government officials.

30.     Daimler, for example, maintained a TPA called "Consulting Egypt" for the benefit of a senior official of a government-owned factory that purchased Daimler chassis and parts and assembled and sold personnel carriers to the Egyptian Army. From 1998 to 2004,

Daimler paid the official through credits to the TPA 1,123,224 Deutsche Mark ("DM") and later €322,101 to secure the sale of vehicle chassis and fire trucks to the factory.

31.     TPAs were also funded by money obtained from the government customers themselves through one of several bogus pricing mechanisms, such as "price surcharges," "price inclusions," or excessive commissions, "discounts" or "rebates."

32.     These artificial pricing mechanisms were used by Daimler or its agent to build a reserve into the price the government customer paid for the vehicle, which was credited (*i.e.*, kicked back) into a TPA and later paid out as a bribe to or for the benefit of foreign government officials.  In the case of artificial discounts or rebates on sales contracts, all or a portion of the discount would be kicked back, through the TPA, to a foreign government official, rather than the purchasing government customer.

33.     Under this scenario, Daimler held the money generated from a fraudulent pricing arrangement in a TPA until the TPA beneficiary or Daimler subsidiary or agent directed a transfer of the funds.  Daimler, however, did not accumulate any interest or other charges for maintaining these funds for its account holders and the funds could be carried on the Company's books indefinitely.

34.     Prior to 2002, Daimler's TPA policies also permitted senior executives, including the former head of Overseas Sales, the former head of finance and controlling for Overseas Sales and former heads of subsidiaries, to authorize cash disbursements from TPAs.

35.     The cash was disbursed from a "cash desk" located at a Daimler facility in Stuttgart, Germany, and a corresponding debit was booked to the relevant TPA.

36.     Daimler failed to adequately monitor where cash was being directed or whether cash disbursements were being made for legitimate business purposes.

37.     In connection with its government customers in Nigeria, for example, Daimler employees withdrew DM 400,000 and $150,000 from the cash desk and transported the Marks and US dollars to Nigeria to pay bribes to foreign government officials.

38.     In 2002, Daimler closed its cash desk in Stuttgart, but cash payments continued to be made through its subsidiaries or through offshore bank accounts. Daimler instituted new policies in 2002 requiring the beneficiaries of TPAs to designate a "reference bank account" to which payments could be wired or otherwise transferred (eliminating the need for cash disbursements). However, the policies did not require that the bank account be maintained in a country in which the account holder resided or where the services of the bank account beneficiary were purportedly rendered.

### 1.     Daimler Paid Bribes Through TPAs in Nigeria

39.     Daimler made bribe payments and kept funds that were not properly recorded on its books through four TPAs that were held by Anambra Motor Manufacturing Company ("Anammco"), a then Daimler-controlled joint venture between Daimler and the Federal Military Government of the Federal Republic of Nigeria, through which Daimler sold vehicles into Nigeria. Daimler sold its interest in the joint venture in 2007.

40.     A portion of Daimler's proceeds from the sale of vehicles in Nigeria was credited to the Anammco TPAs. Senior executives of Daimler then used a portion of these credits to fund improper payments to foreign government officials.

41.     Between 1998 and 2005, Daimler paid approximately DM 3.9 million, $1 million and €230,000 in improper payments to Nigerian government officials. The bribe payments from the Anammco TPAs were made to secure sales contracts worth approximately $73 million with at least seven different government customers. These payments were either improperly recorded

in Daimler's books and records or were not recorded at all and were made as a result of weak internal controls.

42.      The Anammco TPAs were controlled by the former head of Overseas Sales and the former head of Daimler's Nigerian office through which Daimler carried out its business in Nigeria (the "Nigerian representative office"), who also was the managing director of Anammco. These two former executives had decision-making authority over the sales operations in Nigeria, and they were able to direct large scale bribe payments.

43.      For example, in order to obtain a deal to sell armored vehicles to the Nigerian government, the former head of Overseas Sales authorized the former head of Daimler's Nigerian representative office to debit an Anammco TPA and pay DM 200,000 and DM 50,000, respectively, to two senior Nigerian government officials, who had decision-making authority over the contract. Daimler employees then wired the funds to the personal foreign bank accounts of these two officials in England and Germany.

44.      Similarly, in order to obtain another deal involving the sale of commercial vehicles to a Nigerian state-owned entity, the former head of the Nigerian representative office effectuated a debit of nearly €200,000 from an Anammco TPA and had the funds wired from a Daimler bank account in Germany to a bank account in England held by the entity's managing director.

45.      The former head of Overseas Sales and the former head of the Nigerian representative office also routinely withdrew large sums of cash in various currencies from Daimler's corporate cash desk in Germany to make bribe payments to secure business in Nigeria.

46.      Daimler failed to adequately monitor the amount of cash that could be withdrawn through the cash desk or understand the purpose of the withdrawals. The former head of the

Nigerian representative office, for example, was authorized by the former head of Overseas Sales to debit an Anammco TPA to obtain DM 400,000 in cash from the cash desk for use towards the hotel stay, travel, dining and shopping of a senior Nigerian government official, his delegation and their relatives.

47.     In connection with the contract to sell buses to a Nigerian state-owned entity, the former head of the Nigeria representative office withdrew $110,000 in cash from the cash desk and delivered the funds from Germany to Nigeria to make bribe payments to government officials affiliated with the entity.

48.     At one point, the former head of the Nigerian representative office and a senior sales manager for Anammco opened up at least two Swiss bank accounts, which were funded by credit balances in Anammco TPAs.

49.     The former head of Overseas Sales authorized approximately DM 2.1 million to be transferred from Anammco TPAs into these Swiss bank accounts for payment to government officials to obtain sales contracts with various agencies of the Nigerian government.

### 2.     Star Auto, S.A.

50.     Daimler made a series of bribe payments through a TPA that was maintained for the benefit of Star Auto S.A. ("Star Auto"), at the time a Daimler majority-owned and controlled entity based in the Ivory Coast.

51.     Star Auto operated as Daimler's general dealer in the Ivory Coast, and sales intermediary when direct sales were made between Overseas Sales and West African customers. Star Auto operated a regional center for coordinating sales in 14 West African countries. Daimler sold its interest in Star Auto in 2008.

52.     The former head of Overseas Sales, the former head of finance and controlling for Overseas Sales, and the former managing director of Star Auto controlled the Star Auto TPA.

53.     The three former Daimler executives also controlled an off-the-books German bank account at Volksbank, which was used in conjunction with the Star Auto TPA to make improper payments and existed outside Daimler's accounting system.

54.     Through the Star Auto TPA and the bank account at Volksbank, the three former executives made improper payments to government officials in Ghana, Liberia and Poland in the amounts of DM 630,000, $170,000 and €111,175, securing at least $24.5 million in vehicle sales between 1998 and 2004.

55.     The three former executives disguised the true purpose of the payments from the Star Auto TPA, which resulted in inaccuracies in Daimler's books and records.

56.     For example, in an effort to enter the trucking market in Poland through the sale of 30 trucks to a Polish government entity and establishment of a local office in Warsaw, in 2004 former Daimler executives made cash bribe payments totaling €100,000 to a high ranking Polish government official who represented the government entity in the deal.  The cash was withdrawn from the Star Auto account at Volksbank against credit balances in the Star Auto TPA and personally delivered by the former head of Overseas Sales and another senior Overseas Sales executive to the government official at a hotel room in Stuttgart, Germany.  The former managing director of Star Auto then improperly noted in an internal memo that €60,000 of the €100,000 was paid in connection with "service expenses for major Polish customers (Mail road construction project)."  Similarly, the remaining €40,000 cash payment was improperly referenced in an internal document as a payment for "consulting services with regard to the Warsaw branch office for trucks."

57.     In other deals where Daimler used the Star Auto TPA to make the bribe payments, the Company used phony intermediaries or its own outside dealers to disguise the true nature and purpose of the payments.

58.     Daimler, for example, obtained a sales contract to supply 100 trucks to the government of Liberia by providing a free armored Mercedes G 500 vehicle worth nearly $600,000 to a senior Liberian government official.  Daimler then arranged to pay its outside dealer in Liberia $600,000, which was mischaracterized as commissions, and which the dealer then used to pay for the vehicle.  This deceptive structuring of the deal made it appear as if the dealer purchased the vehicle when, in fact, Daimler employees gifted the vehicle to the Liberian government official as a bribe

### 3.     Daimler Refuses to Stop Using TPAs to Make Bribes Despite Risks

59.     For many years, Daimler used TPAs to make bribes despite being aware of the legal risks associated with the accounts.

60.     An internal audit report, dated March 24, 1986, acknowledged that the accounts might violate the laws of other countries and that disclosure of the TPAs to certain governments could pose "significant difficulties" for the Company as well as the beneficiaries of the accounts.

61.     Consequently, pursuant to corporate policy, TPAs were maintained with "absolute confidentiality" and only "in the knowledge of a few [Daimler] employees."

62.     After foreign bribery became illegal in Germany in 1999, Daimler's internal audit department placed senior executives at the Company on notice that internal control weaknesses associated with the TPAs left the accounts susceptible to being used for bribery.

63.     The former head of internal audit for Daimler's operations outside of North America became concerned that the approximately 200 TPAs in existence at that time would

continue to be used for effectuating bribes, as had been Daimler's practice prior to the change in German law. Concerned about this risk and possible misuse of the TPAs, in early 2000, the internal audit head directed his internal audit staff to conduct a review of all the Company's TPAs.

64. In a May 2000 memo to senior sales and finance personnel, Daimler's internal audit staff warned that there was a high risk that the TPAs did not comport with either the Company's Integrity Code or changed German law. Another internal audit memo stated that, by not revising guidelines over the use of TPAs, the Company could be viewed as facilitating "fraudulent transactions within the organization."

65. The May 2000 memo further noted that, given the lack of internal controls over TPAs, internal audit could be held responsible for failing to take remedial measures should certain transactions occur and become public.

66. Accordingly, the May 2000 memo recommended that internal audit, among other things, review all TPAs to determine whether commission payments were legitimate, conduct audits of all operational sales departments to "identify favors granted that might be problematic from a legal point of view and cancelling them as soon as possible," and obligate all Daimler contract partners to provide written confirmation that no commission or resale price margins would be passed through to "sub agents."

67. In the same memo, internal audit also recommended to senior executives of Overseas Sales and the finance and accounting department that the Company: (1) close the TPAs unless there is documented proof that the funds in TPAs are necessary for legitimate business purposes; (2) obtain documented proof of actual services rendered by an outside agent and

business partners before paying commissions; and (3) obtain representations that commissions are not passed through to "sub agents."

68.     In August 2000, the internal audit staff created a formal audit report entitled "Review of Internal Control Procedures Invoicing Process GFN/L" that addressed internal controls risks surrounding TPAs.

69.     The summary of the audit report, which was sent to certain members of the Board of Management, reflected that "the correctness of invoice processing and settlement of commissions/discounts are subject to serious risks," including the "[a]bsence of central obligatory internal controls principles for the respective business units" of the Company.  The summary further stated that such internal controls issues increase the risk of fraud and "endangers the adherence to the [Company's] Integrity code."

70.     The body of the August 2000 report, which was sent to senior finance and sales executives, went on to further state that internal controls surrounding the invoicing, commission payments and rebate accounting in the sales organization were weak, lacked central oversight and subjected Daimler to fraud risks.

71.     The body of the report further noted that there were "fundamental gaps in security" in the way the sales organization paid commissions and invoiced customers "which will necessarily lead to serious risks of fraudulent acts to the detriment of [Daimler] and to corresponding risks with respect to compliance with the Integrity Code."

72.     Despite such warnings from internal audit, those who received the summary and body of the internal audit report failed to direct the Company's accounting department to improve internal controls surrounding the TPAs, let alone close the accounts.

73. The Board of Management failed to direct internal audit to audit the TPAs and associated bank accounts to determine whether the TPAs were operating in compliance with anti-bribery laws.

74. Daimler's internal audit staff also faced pressure to keep TPAs open from former senior Overseas Sales executives, such as the former head of Overseas Sales and the former head of finance and controlling for Overseas Sales, who feared a potential loss of sales volume if the TPAs were eliminated. As reflected in internal audit memos, former Overseas Sales management also resisted improvements in internal controls and transparency for the TPAs.

75. In 2002, although the Company decided to reduce the number of TPAs to 50 and shut down its central cash desk, cash payments continued to be made through cash desks and bank accounts controlled by its subsidiaries, and the Company failed to effectively improve controls surrounding the remaining TPAs.

76. The 50 TPAs remained open over the objections of the internal audit head, and his department's efforts to rein in the use of TPAs was hampered by Daimler's decentralized corporate structure and, according to the internal audit head, the Company's expectation that internal audit not serve a "police function."

77. Internal audit ultimately recommended that senior sales management—the individuals most responsible for directing bribes to secure sales—conduct a "self-audit" to determine whether bribes were paid from the TPAs. The remaining open TPAs were closed in 2004 and 2005, only after the Commission began its investigation.

**B.**     **Daimler Used Other Ledger Accounts to Facilitate Bribes**

78. In addition to TPAs, Daimler used a variety of other ledger accounts to make corrupt payments to foreign government officials to secure vehicle sales and other business.

79.     Similar to TPAs, the money in the other ledger accounts used for bribes was often generated from fraudulent pricing arrangements.

80.     In connection with certain sales of passenger cars in Russia and commercial vehicles in China, for example, Daimler and certain of its subsidiaries and affiliates routinely over-invoiced the government customers between 10%-30% for phony add-ons such as parts or services that were not delivered (and never intended to be delivered), resulting in an overpayment of the inflated contract price. The excess amount was then passed on to high-ranking government officials through credits to inter-company and debtor accounts associated with the respective transactions, which were then transferred to bank accounts designated by foreign government officials.

81.     The improper payments to government officials or their designees through these ledger accounts were either not recorded on Daimler's books and records or inaccurately recorded to disguise the true nature of the payments.

82.     Daimler, for example, sold passenger cars to two Russian governmental entities. Daimler maintained on its books credit balances that were also used by certain Daimler employees to make improper payments to bank accounts designated by government officials associated with the two Russian governmental entities. Credits to these accounts were mislabeled as "commissions," or "special discounts," or identified as "N.A."

83.     In connection with government sales in Vietnam, former senior sales executives at Daimler's MB Vietnam subsidiary improperly booked corrupt payments in several expense accounts designated as "Key Accounts," Costs of Good Sold, "Gifts Line," "Petty Cash," and "Broker Commissions."

84.     Likewise, Daimler's Indonesian subsidiary misused "employee vendor accounts," which were intended for booking employee travel-related expenses, for booking large cash disbursements to officials from a state-owned company.  Many of these payments were also characterized as "fulfillment of commitment" on internal payment authorization sheets and were improperly booked on Daimler's corporate accounting system as "cost of goods sold."

85.     Cash was also withdrawn against certain "omnibus" accounts and noted on payment instructions as "to be handed to the customer" without recording the true nature of the payment on Daimler's books.

86.     In connection with the sale of a commercial vehicle to a government customer in Russia, for instance, former Daimler employees made cash payments to two government officials totaling DM 9,191.34.  Both payments were referenced internally as "social support" payments.  At least one of these payments was evidenced by a receipt signed by a government official.  A former employee of Daimler's subsidiary in Russia, pursuant to orders from superiors, withdrew these funds from his own bank account in Germany, flew to Russia with the cash in a suitcase, paid the officials in cash, and was later reimbursed by Daimler.

**C.     Daimler Paid Kickbacks in Connection with the United Nations Oil for Food Program**

87.     Daimler's involvement in the payment of bribes through the Oil for Food Program took two forms -- direct sales and indirect sales through third parties.  Both avenues involved the secret payment of ten percent kickbacks to Iraqi government-controlled accounts in a manner designed to avoid detection by U.N. inspectors.  The payments were characterized as "after sales service fees" ("ASSFs"); however, no services were actually performed.  The fee was effectively a kickback paid to the Iraqi regime.  Daimler's accounting for its Oil for Food transactions failed properly to record the nature of the kickback payments that the company either authorized or

18

made. The ASSF payments were not identified in the official purchase contracts provided for the U.N.'s review and were not made through the U.N.'s authorized payment channels. Daimler's profits on these Oil for Food Program contracts totaled $4,121,313.

88.     The U.N. Security Council established the Oil for Food Program to address a humanitarian crisis in Iraq that resulted from trade sanctions levied on Iraq by the U.N. and the U.S. following Iraq's invasion of Kuwait in 1991. Under the Program, the then Iraqi government was permitted to sell crude oil, the proceeds of which flowed into a U.N.-controlled escrow account, and the Iraqi regime was permitted to use the proceeds to purchase humanitarian supplies. The kickbacks paid in connection with the Oil for Food contracts had the effect of diverting funds out of the escrow account and into accounts under the control of the Iraqi government. The Company knew that the ASSF payments were prohibited by the Oil for Food Program and by the relevant trade sanctions.

89.     Between April and October 2001, Daimler entered into seven direct contracts with Iraqi ministries. In all seven transactions, Daimler officials in the Iraq sales office of Overseas Sales entered into side agreements with the Iraqi ministries in order to obtain the U.N. contracts. Daimler did not disclose to the U.N. the side agreements, which called for illegal kickback payments totaling approximately $1 million. Of the seven contracts, only one resulted in the delivery of a vehicle to Iraq before the U.S. invaded Iraq in March 2003. This transaction involved the payment of a $7,134 kickback to an Iraqi government ministry.

90.     Daimler officials took affirmative steps to conceal the nature of the ASSF kickbacks. Following the U.S. invasion, for example, the U.N. demanded that Daimler eliminate the ASSF kickbacks from an Oil for Food contract to supply mobile workstations. A Daimler official falsely represented to the U.N. that the ASSF was "a special discount" and that

it was never Daimler's "intention to pay such amount to any third party." The Daimler official knew that the ASSF payment was not a discount on the contract price, and was instead an "under-the-table" kickback to be paid at the direction of Iraqi government officials.

91.    On another contract, Overseas Sales employees concealed the illegal ASSF kickback by evading the established U.N. payment channels. They disguised the kickback as a legitimate commission to Daimler's agent in Iraq whose company provided warranty service on Daimler vehicles in Iraq. Daimler inflated the agent's commission by $7,134, and the agent wired that amount from his company's Swiss bank account to the Iraqi government-controlled account at the Housing Bank for Trade and Finance in Amman, Jordan. Daimler improperly recorded the payment as a legitimate agent commission.

92.    Ultimately, Daimler conducted most of its Iraqi business under the Program through third parties. Under the third-party agreements, Daimler sold trucks, truck chassis, and spare parts to companies in the Middle East and other countries. Daimler's contract partners typically modified the vehicles and resold them to Iraqi ministries, paying the standard 10% kickback. In total, Daimler entered into twelve third-party contracts in which its contract partners made an estimated $5 million in ASSF payments.

93.    The Daimler officials who negotiated the third-party contracts knew or should have known that Daimler's contract partners would pay illegal kickbacks to Iraqi ministries. For example, Daimler obtained copies of contract files containing resale agreements between its contract partners and the Iraqi ministry end-purchasers. The contract files included the secret side agreements to pay ASSF kickbacks. One internal Daimler email message acknowledged the side letters using the German abbreviation K.D. for "Kundendienst," or after-sales services payment.

**D.**   **Daimler Bribed Through Phony Intermediaries and Consultants**

94.   Daimler routinely used sham intermediaries and consultants to funnel payments to government officials in several countries, including Russia, Latvia, China, Uzbekistan, Greece, Turkey, Hungary, Ghana, Nigeria, and Vietnam.  Several of these corrupt payments were made to U.S. bank accounts controlled by nominees for the foreign government officials.

95.   In China, Daimler funneled bribes to government officials through as many as 71 "intermediaries"—many of whom were associated with phony consulting contracts or entities with no actual business operations.

96.   In connection with contracts worth €37,415,070 to sell 302 buses and 4 vans to an Uzbekistan government agency, for example, Daimler's EvoBus subsidiary paid a total of approximately €3.5 million in improper payments to shell companies of government officials to obtain the deal.

97.   Daimler's internal price calculation sheets marked "confidential" reflect that EvoBus sales executives promised to pay certain Uzbek government officials 10% of the underlying net sales price of the bus deal, or approximately €3.5 million.

98.   Daimler entered into phony consulting agreements with these shell companies about one month before executing the sales contract with the Uzbek government agency, while internally referring to the payments in connection with the agreements as "N.A."

99.   The payments were sent to a bank account in England and another in Switzerland held by two nominee companies incorporated in the British Virgin Islands.

100.   Similarly, in order to obtain contracts to sell 117 buses to a city in Latvia in deals worth approximately €30 million, the former head of sales for MB Buses at EvoBus executed consulting agreements involving no discernible services with two U.S.-incorporated nominees

for City Council members, and paid those entities €1,251,274 in connection with the bus contract.

101.     The arrangement to pay the Council members "under the table money" through nominees was reflected in several internal EvoBus documents. A March 24, 2002 memo reflects that a 5% commission on the underlying deal (or €216,115) would be made through one of the U.S. incorporated nominees to the members of a political party in the Latvian city, who controlled the City Council at the time, including the son of a high-ranking government official whose father had influence over the tender.

102.     Other internal documents show that later corrupt payments to members of a political party on the Latvian City Council, who also had influence over the tender, were made through the other of the two U.S. nominees.

103.     Daimler routinely made payments to foreign government officials through nominee and personal bank accounts in Latvia, the United States and other countries with no other association to the sales transactions at issue.

104.     For example, in order to obtain a contract for the sale of four vehicles to a Russian government agency, Daimler wired €110,000 to a German bank account held in the name of a senior official at that government agency.

105.     In addition, Daimler wired funds to bank accounts in Latvia held by five corporate nominees of the senior official from the Russian government agency, his wife and other individuals close to him.

106.     After the Commission's FCPA investigation started, in order to circumvent new controls that had been put in place, Daimler paid "commissions" totaling €488,320 to a third-party intermediary named by the senior official from the Russian government agency. The third-

party intermediary instructed Daimler to wire the so-called commission payments to Latvian bank accounts, one of which was previously held in the name of an earlier nominee of the senior official from the Russian government agency.

### E.    **Daimler Made Bribes Through Dealers and Distributors**

107.    In countries such as Greece, Liberia, Turkmenistan, Latvia, and Bulgaria, Daimler utilized certain of its in-country dealers and distributors as corrupt intermediaries to facilitate deals with government customers, pass bribes to government officials and assist Daimler in hiding the true nature of the corrupt payments on its books.

108.    In Greece, for instance, Daimler's long-time Mercedes general representative owned part of a principally-state-owned company that supplied vehicles to a Greek government agency. Daimler engaged the Greek representative to use his influence to secure the sale of 645 vehicles to the Greek government agency and coordinated with the representative to pass bribe payments to government officials through phony consultants and intermediaries.

109.    In connection with this deal, Daimler paid nearly DM 17 million, which was shared between officials of the Greek government agency and the Greek representative.

110.    Similarly, in order to enter the market and secure business in Turkmenistan, Daimler, with the aid of its distributor in Turkmenistan, provided gifts personally to a senior government official of Turkmenistan, who had decision-making authority over Daimler's sales contracts with the Turkmen government.

111.    These gifts took the form of two armored vehicles worth at least €550,000 in total and the German translation and publication of a book authored by the Turkmen senior government official. There were also at least $2 million in payments to the distributor and other

third parties that were characterized in Daimler documents as N.A. payments and additional costs.

**F.**     **Daimler Provided Government Officials Lavish Travel**

112.     In connection with Daimler's commercial vehicle business in China, Daimler routinely executed side agreements with its government customers through which the Company agreed to return a certain percentage of the contract or a specific amount of money to the customer—mislabeled as a special commission or special discount—for the purpose of funding lavish trips for government officials.

113.     The "delegation trips" funded by the so-called discounts and commissions were in reality lavish vacations to European cities for Chinese government officials and their relatives.

114.     In order to sell two commercial vehicles to a Chinese government agency, for example, Daimler executed side agreements stating that €11,000 as a "special commission" would be returned to the customer once full payment was received on the commercial vehicles and that Daimler would pay for accommodations and flights for a six person delegation to visit "Germany/Europe."

115.     As reflected in internal documents, Daimler later allocated €11,000 towards financing a lavish vacation for six officials to Luxembourg, Amsterdam, Brussels, Paris, Rome, Florence, Venice and Munich. In total, between 1999 and 2006, Daimler paid for at least 16 such delegation trips in connection with $120 million in vehicle sales to the Chinese government customers.

**FIRST CLAIM**
**[Violations of Section 30A of the Exchange Act]**

116.     Paragraphs 1 through 115 are re-alleged and incorporated by reference.

117.    As described above, Daimler, and certain of its subsidiaries, through means or instrumentalities of U.S. commerce, corruptly offered, promised to pay, or authorized corrupt payments to a person, while knowing that all or a portion of those payments would be offered, give, or promised, directly or indirectly, to foreign government officials for the purposes of influencing their acts or decisions in their official capacity, inducing them to do or omit to do actions in violation of their lawful duties, securing an improper advantage, or inducing such foreign officials to use their influence with a foreign government or instrumentality thereof to assist Daimler in obtaining or retaining business.

118.    By reason of the foregoing, Daimler violated the anti-bribery provisions of the FCPA, as codified at Section 30A of the Exchange Act [15 U.S.C. §78dd-1].

**SECOND CLAIM**
**[Violations of Section 13(b)(2)(A) of the Exchange Act]**

119.    Paragraphs 1 through 118 are re-alleged and incorporated by reference.

120.    As described above, Daimler, and certain of its subsidiaries, failed to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflected its transactions and dispositions of its assets.

121.    By reason of the foregoing, Daimler violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

### THIRD CLAIM
**[Violations of Section 13(b)(2)(B) of the Exchange Act]**

122.    Paragraphs 1 through 121 are re-alleged and incorporated by reference.

123.    As described above, with respect to improper payments to foreign officials, Daimler and certain of its subsidiaries failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) payments were made in accordance with management's general or specific authorization; and (ii) payments were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for its assets.

124.    By reason of the foregoing, Daimler violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

A.    Permanently restraining and enjoining Daimler from violating Sections 30A, 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78dd-1, 78m(b)(2)(A), and 78m(b)(2)(B)];

B.    Ordering Daimler to disgorge ill-gotten gains wrongfully obtained as a result of its illegal conduct; and

C.    Granting such further relief as the Court may deem just and appropriate.

Dated:  March ⎧⎩, 2010

Of Counsel
Gerald W. Hodgkins  (DC Bar No. 447678)
Conway T. Dodge
Anita B.  Bandy (DC Bar No. 465629)

Cheryl J. Scarboro (DC Bar No. 422175)
Tracy L. Price
Robert I. Dodge (DC Bar No. 418914)

Frederick L. Block (DC Bar No. 492358)
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C.  20549
Tel: 202-551-4919
Fax: 202-772-9245
BlockF@sec.gov

Attorneys for Plaintiff